**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| LG PHILIPS DISPLAYS USA, INC. | ) | Case No. 06-10245 (BLS) |
| | ) | |
| | ) | **Related to Docket Nos. 17,** |
| Debtor. | ) | **193, 228 and 233** |

**MEMORANDUM OPINION**[1]

Before the Court is the Debtor's Motion for Rejection of Unexpired Leases and Executory Contracts Nunc Pro Tunc to the Petition Date (the "Motion"). Delafoil Ohio, Inc. f/k/a Delafoil Ohio, LLC opposes the Motion. Because the contract at issue is not executory, the Court will deny the Motion.

I.  BACKGROUND

   A.  Introduction

The facts giving rise to this dispute span nearly a decade, and involve multiple parties, many contracts, several lawsuits, a settlement and numerous ownership or name changes. These facts are set forth in detail in Section B below. The crux of the dispute, however, may be summarized as follows: in 1996, the Debtor's predecessor acquired an option to purchase the Premises (as defined below) for $2.4 million. Six years later, to resolve pending litigation, the Debtor agreed via a Settlement Agreement

---

[1] This Opinion constitutes the findings of facts and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

to allow Delafoil to exercise that option.  The Debtor today wishes to reject the Settlement Agreement and then to exercise the purchase option itself.  Presumably the Premises is worth more than $2.4 million, as both Delafoil and the Debtor seek to exercise the purchase option.  The main issue before the Court is whether the Settlement Agreement is an executory contract that may be rejected by the Debtor.

    B.   <u>The Delafoil Agreements</u>

This dispute derives from an August 15, 1996 lease (the "Lease") between Waverly Investment LLC ("Waverly") and Delafoil Ohio, LLC ("Delafoil LLC") whereby Waverly agreed to lease to Delafoil LLC land and a manufacturing facility (the "Facility," and together with the land, the "Premises") located in Perrysburg, Ohio.  The initial term of the Lease was approximately ten years, and is set to expire on September 30, 2006 (the "Primary Term").  In exchange, Delafoil LLC assumed Waverly's rights and obligations under the June 12, 1996 Production Agreement between Waverly and Philips Display Components Company ("PDC"), a division of Philips Electronic North America Corporation ("PENAC").  Terms of the Production Agreement included:  (1) Waverly's agreement to construct and operate the Facility; (2) PDC's agreement to purchase all of the Facility's manufactured television picture tube components, including television panel mask assemblies ("PMAs") and other

metalware; and (3) PDC's obligation to pay certain fixed costs (the "Contingent Expenses").

Also under the Lease, Delafoil LLC agreed to pay Waverly a monthly rental fee (the "Basic Rent") as well as any additional rent and other amounts due under the Lease Agreement, including real estate taxes, insurance costs, sales tax, and utility services (the "Supplemental Rent"). PDC assumed this payment obligation by agreement dated September 30, 1996 (the "Payment Agreement"). In the Payment Agreement, the parties further defined Supplemental Rent to include any Contingent Expenses.

The final provision of note under the Lease, and most relevant to the instant matter, was Waverly's grant to Delafoil LLC of an option to purchase the Premises for $2.4 million at the expiration of the Primary Term (the "Initial Option"). In the Lease, Delafoil Ohio assigned the Initial Option to PDC.[2] If PDC failed to exercise the Initial Option, Delafoil LLC could do so (the "Fallback Option").

Following a 1999 ownership change, Delafoil Ohio, Inc. ("Delafoil") succeeded to all of Delafoil LLC's right, title, and interest in the Lease. In 2001, PENAC and other entities formed LG Philips Displays USA, Inc. (the "Debtor"), which ultimately replaced PDC as the third-party beneficiary of the Initial Option

---

[2] PDC was not a signatory to the Lease. The Debtor contends that, as successor to PDC, it is a third-party beneficiary under the Lease.

in the Lease and assumed PDC's obligations under the Production and Payment Agreements.

The contractual relationship described above was substantially modified in April 2002. To resolve litigation commenced against the Debtor by certain Delafoil investors and their lender (the "Plaintiffs"), Delafoil, the Plaintiffs, the Debtor, and PENAC entered into a General Release and Settlement Agreement (together with exhibits to that agreement, the "Settlement Agreement").[3]

The Settlement Agreement modified the Debtor's obligations under the Payment Agreement, requiring the Debtor to pay only Basic Rent and the real property tax and insurance portions of the Supplemental Rent (the "RTI Obligations"). Under the terms of the Settlement Agreement, Delafoil became liable for any Contingent Expenses or Supplemental Rent that did not constitute RTI Obligations. The Debtor represents that it continued to pay RTI obligations of approximately $205,000 per month until February 2006.

Additionally, the Settlement Agreement also modified the Debtor's obligations under the Production Agreement, which had originally required the Debtor to purchase from Delafoil certain metalware as well as all of the PMAs required for its Ottawa,

---

[3] By Order of the Court dated June 6, 2006, the Settlement Agreement (with exhibits) was filed under seal and hence is not substantially quoted from or otherwise disclosed herein.

4

Ohio facility (the "Ottawa Facility").  In contemplation of the eventual wind-down of operations at the Ottawa Facility, and the transition of those operations to Mexico, the Settlement Agreement terminated the Production Agreement and obligated the Debtor only to purchase from Delafoil specified quantities of PMAs and metalware until March 31, 2003.  For Delafoil's production of PMAs, the Debtor agreed to supply certain equipment that involved the use of proprietary information and property.  Following the March 2003 cessation of PMA production and shipment, all of the equipment was returned to the Debtor or sold by Delafoil.  Accordingly, any vendor/customer relationship between Delafoil and the Debtor ceased over three years ago. Delafoil terminated all of its remaining manufacturing operations at the Premises in December 2005.

Finally, under an Option Rights Modification Agreement annexed to and made part of the Settlement Agreement, Delafoil was given the right to either exercise the Initial Option or extend the term of the Lease.  In the event Delafoil failed to do either, the Debtor received the right to exercise the Fallback Option.  In essence, under the Settlement Agreement the Debtor and Delafoil switched places when it came to the right to exercise the Initial Option and the Fallback Option.

    C.    <u>Procedural History</u>

The Debtor sought bankruptcy protection under chapter 11 of

the Bankruptcy Code on March 15, 2006 (the "Petition Date"). That same day, the Debtor filed the Motion seeking to reject the Settlement Agreement[4] <u>nunc</u> <u>pro</u> <u>tunc</u> to the Petition Date. Delafoil objected (the "Objection") to the Motion arguing, as threshold matters, that the Motion did not clearly identify the agreements proposed to be rejected and that the Settlement Agreement was not executory.  Delafoil further argued that, even if the Court found the Settlement Agreement to be executory, the Debtor's decision to reject it was not a proper exercise of its business judgment.  Finally, Delafoil contended that rejection of the Settlement Agreement would not affect its right granted in the Option Rights Modification Agreement to exercise the Initial Option.

The Debtor contends that the Settlement Agreement is executory, and thus susceptible to rejection under section 365(a) of the Bankruptcy Code.  The Debtor further argues that its decision to reject the Settlement Agreement satisfies the relatively modest threshold of the business judgment test.

A hearing was held on May 25, 2006 on the Motion and the Objection.  Following conversion of this case to Chapter 7 on May 28, 2006, the Court afforded the Chapter 7 Trustee the opportunity to submit papers supplementing the record and stating

---

[4] The Debtor also sought to reject three other agreements (unrelated to Delafoil) pursuant to the Motion.  The Court granted the Motion with respect to these agreements on April 24, 2006 [Docket No. 145].

6

its position on the dispute.  The Chapter 7 Trustee has done so by pleadings dated June 5, 2006 and June 15, 2006.  This matter is now ripe for decision.

II.  <u>JURISDICTION</u>

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

III.  <u>DISCUSSION</u>

Rejection of an executory contract is governed by section 365(a) of the Bankruptcy Code.  Specifically, section 365(a) provides as follows:

> Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(a).  The term "executory contract" is not defined in the Bankruptcy Code.  The relevant legislative history teaches that executory contracts "generally include[] contracts on which performance remains due to some extent on both sides." H.R. REP. NO. 95-595, at 347 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6303-04; S. REP. NO. 95-989, at 58 (1978), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 5844; <u>accord</u> <u>Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.</u>, 872 F.2d 36, 39 n.4 (3d Cir. 1989).

In construing the term "executory contract," the overwhelming majority of courts – including the United States Court of Appeals for the Third Circuit – has adopted the "Countryman Definition," formulated by Professor Vern Countryman in a seminal 1973 law review article.  Vern Countryman, <u>Executory Contracts in Bankruptcy:  Part I</u>, 57 MINN. L. REV. 439 (1973).  That standard, applicable in this jurisdiction, provides that an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  <u>Id.</u> at 460; <u>accord</u> <u>Enterprise Energy Corp. v. United States (In re Columbia Gas Sys. Inc.)</u>, 50 F.3d 233, 239 (3d Cir. 1995); 5 OXFORD ENGLISH DICTIONARY 523 (James A.H. Murray et al. eds., 2d ed. 1989) (defining executory as "capable of taking full effect at a future time.  Opposed to <u>executed</u>.").  The relevant time for determining whether the Settlement Agreement is executory is the Petition Date.  <u>Columbia Gas</u>, 50 F.3d at 240.

It is axiomatic that an executory contract must be assumed or rejected in its entirety, <u>Sharon Steel</u>, 872 F.2d at 41; a party may not pick and choose among elements of a contract to assume or reject.  "Correspondingly, all of the contracts that comprise an integrated agreement must either be assumed or rejected, since they all make up one contract."  <u>In re Exide</u>

Techs., 340 B.R. 222, 228 (Bankr. D. Del. 2006) (citing Philip Servs. Corp. v. Luntz (In re Philip Servs., Inc.), 284 B.R. 541 (Bankr. D. Del. 2002), aff'd, 303 B.R. 574 (D. Del. 2003)).

At argument, the Debtor clarified that: (i) its intention was to reject any and all contracts it may have with Delafoil; and (ii) it believed the Settlement Agreement represented the only remaining contract between the parties.  Also at argument, the Debtor and Delafoil conceded that the Settlement Agreement and its related agreements and exhibits constituted a single, integrated transaction for purposes of rejection under section 365(a).

To satisfy its burden of proof, the Debtor offers several different grounds for finding the Settlement Agreement to be an executory contract.  See, e.g., Exide, 340 B.R. at 229 (stating that the party seeking to reject a contract bears the burden of demonstrating it is executory).  First, the Debtor contends that Delafoil's obligation set forth in the Settlement Agreement to reimburse the Debtor for payments made (if any) comprised of non-RTI obligations constitutes an ongoing obligation of Delafoil. As discussed previously, Delafoil's liability for these payments arose in the Payment Agreement and consisted of expenses associated with the Facilities' manufacturing operations.

The Court concludes that the reimbursement provision does not yield an executory contract.  The record reflects that

9

manufacturing operations at the Facility have ceased and that there have been no payments made by the Debtor requiring reimbursement from Delafoil.  Consequently, Delafoil does not have – and will never have, given the cessation of operations – a reimbursement obligation under the Payment Agreement.

The Debtor next focuses on the parties' mutual obligation to maintain confidentiality.  Specifically, Delafoil and the Debtor are obligated under the Settlement Agreement to "keep in strictest confidence all Confidential Information."  Confidential Information includes:

> all non-public information related to any product, vendor or supplier information, customer and dealer information, research, reports, financial data, technical data which is part of the Specifications [defined as 'product designs and specifications that are unique to the PMAs made for' the Debtor], software, software documentation, computer programs, computer code, hardware design, technology, marketing or business plans, forecasts, financial statements, budget, license, price, cost, or personnel data.

Settlement Agreement Ex. M at 2-3.  Additionally, the parties agreed generally not to disclose the terms of the Settlement Agreement, and provided further that "this confidentiality provision is a material term of this Agreement . . . ." Settlement Agreement at 14.  While it is certainly true that confidentiality provisions can, standing alone, give rise to an executory contract, see, e.g., RCI Tech. Corp. v. Sunterra Corp.

(In re Sunterra Corp.), 361 F.3d 257, 264 (4th Cir. 2004) (finding computer software licensing agreement executory where an ongoing duty of confidentiality was owed between the parties), the Court concludes in this case that they do not.

The general confidentiality provisions in the body of the Settlement Agreement appear largely to be "boilerplate" provisions included in the document as a matter of course. Recitations of materiality are probative but not dispositive of whether a contract is executory: the Court must look to both the terms of the agreement and the nature of the transaction to discern whether the contract requires material future performance from both sides. Additionally, the Court notes that the bulk of the confidentiality requirements arise in an exhibit to the Settlement Agreement captioned "Technology & Settlement Agreement." That document speaks almost exclusively to the use of proprietary information and materials in a product manufacturing and supply relationship between Delafoil and the Debtor – a relationship that terminated in 2003.

The record reflects, and it appears to the Court, that the prospects of disclosure of confidential information at this stage are exceedingly remote, and do not rise to a level of material future performance for Delafoil. To decide otherwise, and conclude that the parties' ongoing confidentiality commitments automatically give rise to an executory contract, would vitiate

the Countryman Definition: any contract with routine confidentiality provisions would be forever executory. See, e.g., Anchor Resolution Corp. v. State St. Bank & Trust Co. (In re Anchor Resolution Corp.), 221 B.R. 330, 337 (Bankr. D. Del. 1998) (holding a pre-petition workout agreement non-executory when the only remaining obligation was the non-debtor party's obligation to maintain confidentiality); In re Spectrum Info. Techs., Inc., 190 B.R. 741, 748 (Bankr. E.D.N.Y. 1996) ("[U]pon examining the Employment Agreement, the Court finds that [the non-debtor's] remaining obligations of confidentiality and non-interference are vestiges of that Agreement that do not rise to a level of material future performance.").

Finally, and most significantly, the Debtor argues that the Option Rights Modification Agreement constitutes a right of first refusal, which has been held in this jurisdiction to be an executory contract. In re Kellstrom Indus., Inc., 286 B.R. 833 (Bankr. D. Del. 2002). Debtor's reliance on Kellstrom is misplaced.

In Kellstrom, the debtor moved to reject a right of first refusal to purchase property of the debtor. Id. The holder of the right of first refusal contended that its presently unexercised right of first refusal imposed no obligation upon the holder of the right, so that it could not be executory. Id. at 834. Chief Judge Walrath held that the right of first refusal in

fact did impose burdens on both sides:

> A review of the right of first refusal in this case confirms the executory nature of the contract. The Debtors are obligated to give notice to Sawgrass of any offer to purchase the price and to sell to it if it matches the offer. Sawgrass is required to exercise or waive the right of first refusal within thirty days of the notice.

Id. at 835.  The Court agrees with the holding of Kellstrom, but concludes it is factually inapposite to the circumstances of the instant case.

In Kellstrom, the contractual relationship under the right of first refusal consisted of the debtor (as seller) and the holder of the right (as potential buyer).  The debtor was thus obligated to offer the property to the holder of the right, and as noted, the holder was obligated to exercise or decline its right of first refusal within a specified time period.  Id.

In the present case, the counter-party to the option right is neither the Debtor nor Delafoil, but rather Waverly, the owner of the Premises.[5]  If Delafoil exercises its right under the Option Rights Modification Agreement, it must give notice to Waverly, not the Debtor.  And in that circumstance, it is Waverly, not the Debtor, who is obligated to sell the property to Delafoil.  Likewise, if Delafoil fails to act timely, the

---

[5] The current owner of the Premises is Cahill Property Foundation, Inc.  For simplicity, the Court refers to the owner as Waverly, the original owner of the Premises.

Fallback Option permits the Debtor to purchase the Premises from Waverly. Delafoil simply has no obligation involving the Debtor in either instance.[6]

Because the Court concludes that the Settlement Agreement is not an executory contract and thus may not be rejected, the Court will not address Delafoil's arguments regarding: (i) the Debtor's business judgment; and (ii) the survival of the Option Rights Modification Agreement post-rejection.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the Settlement Agreement is not executory, and thus may not be rejected pursuant to section 365(a). An appropriate order will issue.

By the Court,

Dated: June 21, 2006

Brendan Linehan Shannon
United States Bankruptcy Judge

---

[6] At oral argument, the Debtor suggested that each of the parties is under an implicit obligation to assist one another in the exercise of the option. The Court notes that this argument was not briefed by the parties, and in any event, the Court will refrain, in the absence of any other material obligations, from reading into the Settlement Agreement such an obligation.